UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| **BRIAN A. WEIL and MELISSA D. FULK,**<br>**individually and on behalf of others**<br>**similarly situated,** | ) <br> ) <br> ) <br> ) |
| **Plaintiffs,** | ) <br> ) |
| **v.** | ) **CASE NO. 2:15-cv-00016-JMS-MPB** <br> ) |
| **METAL TECHNOLOGIES, INC.,** | ) <br> ) |
| **Defendant.** | ) |

**DEFENDANT METAL TECHNOLOGIES INC.'S POST-TRIAL BRIEF**

Defendant Metal Technologies, Inc. ("Metal Technologies), by and through counsel and pursuant to the Court's February 13, 2018, Order [Dkt. 390], submits the following post-trial brief. Metal Technologies will first address the Court's two specific briefing issues set forth in its Order, and will then provide its additional final arguments.

**ISSUE ONE:**

As requested by the Court, below is the list of dates where Ms. Fulk's and Mr. Weil's time punches were greater than 15 minutes before or after their shift time, but where no overtime is shown for that particular time:

**Melissa Fulk (All time punches are prior to the start of the shift)** (*See* Exhibit B): August 19, 2014 (18 minutes);[1] August 20, 2014 (29 minutes); August 21, 2014 (25 minutes); August 24, 2014 (30 minutes); August 25, 2014 (27 minutes); August 26, 2014 (27 minutes); September 8, 2014 (16 minutes); September 10, 2014 (19 minutes); November 15, 2014 (17

---

[1] For the August 2014 dates, the above date represents the pay date, not the day she actually clocked in to work. In other words, although Ms. Fulk actually clocked in on August *18*, 2014 at 10:42 p.m., the actual pay date is August 19, 2014, for payroll purposes as she clocked out for her shift at 7:30 a.m. the next day.

minutes); December 5, 2014 (16 minutes); December 17, 2014 (17 minutes); December 21, 2014 (16 minutes); December 30, 2014 (17 minutes).[2]

**Mr. Weil** (*See* Exhibit F): December 8, 2014 (17 minutes before shift).

The Court asks the parties to cite specific evidence that establishes its payment by the Plaintiffs' shift, rather than payment based on the above time punches, was lawful under 29 C.F.R. § 785.48(a). This regulation states that an employer may disregard early and late time punches if an employee (1) voluntarily comes in before their regular starting time or remains after their closing time and (2) does not engage in any work before or after their shift. In other words, this regulation states that it is lawful to pay based on shift start and end times (even if time clocks are used and the employee punches in before or after his shift) provided the employee was not required to come in before or after their shift and is not performing any work. The regulation directly refutes Plaintiffs' contention – argued throughout this case – that all on-the-clock time recorded before or after a shift is compensable regardless of whether the employee demonstrates that he or she was engaged in work during this time.

The regulation does not state that on-the-clock time becomes compensable if an employee punches in more than 15 minutes before their shift or 15 minutes after their shift. Although the regulation states that "major discrepancies" between time punches and work time should be discouraged, this is merely recognizing best practices for record keeping, not a blanket rule that an employee must be paid for any time recorded more than 15 minutes before or after her shift.

---

[2] The following days where Ms. Fulk clocked in 15 minutes prior to her shift are completely offset under the FLSA by the payment of double time: August 4, 2014; August 6, 2014; August 7, 2014; August 8, 2014; August 9, 2014; August 10, 2014; August 11, 2014; August 15, 2014; August 17, 2015; September 7, 2014; September 17, 2014; September 19, 2014; September 21, 2014; September 23, 2014; September 27, 2014; December 8, 2014; and December 11, 2014. (*See* Exhibit 3, p. 2.) Ms. Fulk also has no damages under the IWPA for these dates because she was paid more than her on-the-clock time multiplied by her straight time rate of pay. Ms. Fulk is only seeking straight time pay under the IWPA for off-the-clock time. But because she was paid *more* than her straight time rate for all hours she alleges she worked during these weeks, she has no damages under the IWPA.

Thus, pursuant to 29 C.F.R. § 785.48(a), Ms. Fulk's and Mr. Weil's pre-and post-shift punches may be disregarded by Metal Technologies if they were not working before or after their shift.  The employee bears the burden of proof to establish that he or she performed work for which he or she was not properly compensated.  *Anderson v. Mt. Clemons Pottery Company*, 328 U.S. 680, 686-87 (1946).  Based on their testimony, neither Ms. Fulk nor Mr. Weil met their burden of proof.

Metal Technologies anticipates that Ms. Fulk will argue that simply because she broadly testified that if she was punched in she was working, this satisfies her burden of proof.  But Ms. Fulk must be able to articulate *what specific work tasks she was performing* for this testimony to be at all credible.  Metal Technologies demonstrated through the testimony of Kirbie Conrad, Travis Clagg, and Kyle Pollock that employees could not begin performing their production duties before their shift began because the employees on the previous shift are performing these duties up until the next shift began due to the shift overlap.  Additionally, there was a shift meeting in the breakroom at the start of nearly every shift, so it makes no sense for an employee to report to the cell – rather than waiting in the breakroom – prior to the start of the shift.

The only evidence Ms. Fulk submitted regarding the work tasks she performed prior to the start of her shift was her testimony that – as an "Assistant Cell Lead" – she was required to come in early and gather information from the previous shift employees so that the supervisor would have this information for the shift meeting.  She also testified that as an Assistant Cell Lead she was required several days per week to attend a pre-shift meeting 30 minutes before the start of her shift.  She confirmed that these duties would be reflected in her time punches.  Ms. Fulk's testimony, however, is simply not credible when considered with the other submitted evidence.

*First*, Ms. Fulk's testimony does not match her time punches.  She testified that she became an Assistant Cell Lead the last month or so of her employment.  Ms. Fulk's employment ended on December 30, 2014.  Thus, according to Ms. Fulk, she became an Assistant Cell Lead in late November 2014 or early December 2014.  But Ms. Fulk *never* clocked in 30 minutes before her shift during this time period for these alleged pre-shift meetings.  She also rarely clocked in early *at all* during this time period.  From November 15, 2014 to the end of her employment, Ms. Fulk clocked in before the start of her shift (11:00 p.m.) only seven times out of 38 shifts.[3]  (*See* Exhibit B.)  If she had to gather information for the shift meetings why did she only come in early seven times as an Assistant Cell Lead?  And why was she coming in early some days in August, September, and October when she was *not* an Assistant Cell Lead and did not have these duties?

*Second,* Ms. Fulk's testimony also directly conflicts with the consistent testimony provided by Mr. Clagg and Mr. Pollock, who both supervised Ms. Fulk in the last month or so of her employment.  Both Mr. Clagg and Mr. Pollock testified that Ms. Fulk was an inspector and, consistent with Ms. Conrad's testimony, further testified that Metal Technologies did not have a position of "Assistant Cell Lead."  Both also confirmed that production employees were never required to report to work prior to the start of their shift, including Cell Leads, and that they never saw Ms. Fulk work prior to the start of her shift.  They also testified that they never held or participated in pre-shift meetings with Cell Leads.

*Third*, when Ms. Fulk was asked *specific* questions about her time records, she could provide no explanation for why she clocked in early some days and not others.  For instance, the only time that Ms. Fulk ever clocked in around 30 minutes before her shift was in the first few weeks of her employment (which again contradicts her testimony that she had to attend pre-shift

---

[3] Ms. Fulk clocked in at 10:10 p.m. on December 20, 2014, but she completed an overtime authorization form to account for this time and was paid for this time.  *See* Exhibit D at MTI1254.

meetings 30 minutes before her shift because she was an Assistant Cell Lead).  When she was asked why – after the first three weeks or so – she stopped clocking in this early, she said she was not sure, but she *might* have "switched jobs."  But what job, besides Assistant Cell Lead, required her to clock in 30 minutes before her shift? And what duties was she performing?

Metal Technologies anticipates that Ms. Fulk will argue that she cannot possibly be expected to remember what work duties she performed three years after her employment ended, but it is her burden to submit admissible evidence that would allow the Court to find that her time clock records are accurate, and her testimony simply did not do that; in fact, her testimony cast doubt on the accuracy of the records, as it does not match her time punches.  In any event, Ms. Fulk and Mr. Weil filed their Complaint against Metal Technologies less than *one month* after her employment ended.  [Filing No. 1.]  Her Complaint alleged the following about the work she was required to perform before and after her shift:

> Each Metal Technologies production employee begins his/her shift by swiping a badge to record his/her time.  Generally, each employee must report to work and clock in (swipe a badge) fifteen minutes prior to his/her scheduled start time in order to participate in a shift meeting with a supervisor, receive work instructions for the day, and to assist and relieve the coworker on the earlier shift who had been performing the same tasks.  At the end of the work shift, that same employee must assist the next coworker relieving him/her and, generally, work activity continues to occur after the employee's shift end time.  The employee then clocks out after his transition is complete.

[Filing No. 1 at ¶ 10.]  But neither Ms. Fulk's time punches nor her testimony supports the allegations she made *just after her employment ended* when she could be expected to remember her employment accurately.  It is simply not true that production employees are required to report to work 15 minutes early to attend a pre-shift meeting (the majority of days Ms. Fulk punched in right at the start of the shift and Mr. Weil punched in at the start of the shift every day except one) or that they generally have to continue working after their shift ends (both Ms. Fulk and Mr. Weil

clocked out on time basically every day). This again casts doubt on Ms. Fulk's credibility and demonstrates that she has not met her burden of proof. Notably, nowhere in the Complaint does Ms. Fulk allege that she was required to perform specific duties before her shift because she was an Assistant Cell Lead.

As for Mr. Weil, he testified that the one day he clocked in early for work – December 8, 2014 – he attended a shift-wide meeting that Kirbie Conrad held about health insurance. Interestingly, Ms. Fulk, who presumably also would have attended this meeting, did *not* testify that she recalled attending a shift-wide meeting on this date. Kirbie Conrad, however, testified that any shift-wide meeting for third shift would have been held at 7:00 a.m. (during the 30 minute overlap time with second shift), as she would not be in the building at 10:45 p.m. Mr. Clagg also testified that he recalled a healthcare meeting around this time, but that it occurred at the end of third shift, not the beginning. For these reasons, Mr. Weil's testimony regarding why he clocked in early on this date is not credible.

**ISSUE 2:**

**Question 1: "If Metal Technologies alleges that the "OF" deduction taken from Weil was legal, under what specific federal and/or state authority was that deduction taken?"**

Under the Patient Protection and Affordable Care Act of 2010 ("ACA"), all individuals must maintain "minimum essential" health insurance coverage. 26 U.S.C. § 5000A. To stabilize markets during the first three years of implementation, the ACA established the Transitional Reinsurance Program ("TRP"). *See* 42 U.S.C. § 18061(c)(1). The TRP mandates that "health insurance issuers, and third party administrators on behalf of group health plans, . . . make payments to an applicable reinsurance entity for any plan beginning in the 3-year period beginning January 1, 2014." *Id.* § 18061(b)(1)(A). Thus, the TRP is a payment contribution from a health insurance issuer (such as an insurance company or organization) *or* a group health plan, including

6

self-insured and partially self-insured group health plans.  *See* 45 C.F.R. 153.20.  For the calendar

year 2014, the fee was $63 per covered life under the group health plan.  *See* Patient Protection

and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg.

15410 at 15459-15462; *see also* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-

Stabilization-Programs/The-Transitional-Reinsurance-Program/2014-Benefit-Year-Page.html.

An "employee welfare benefit plan" under the Employee Retirement Income Security Act

of 1974 ("ERISA") has five elements: (1) a plan, fund, or program; (2) established or maintained;

(2) by an employer; (4) for the purpose of providing medical, surgical, hospital care, sickness,

accident, disability . . . benefits; (5) to participants or their beneficiaries.  *See Ed Miniat, Inc. v.*

*Globe Life Ins. Group, Inc.*, 805 F.2d 732, 738 (7th Cir. 1986); *see also* 29 U.S.C. 1001(b) (2001).

A "group health plan" under the ACA is clearly an "employee welfare benefit plan" under ERISA,

an interpretation confirmed by the U.S. Department of Health and Human Services when it

commented in its final rule as follows: "The Department of Labor advised HHS upon its review

of this final rule that paying reinsurance contributions would constitute a permissible expense of

the plan for purposes of Title I of the ERISA because the payment is required by the plan under

the Affordable Care Act."  *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit

and Payment Parameters for 2014, 78 Fed. Reg. 15410 at 15461.

Because the reinsurance contribution constitutes a permissible expense of the plan under

ERISA, it was in no way illegal or a breach of its fiduciary duty for Metal Technologies to pay the

2014 TRP contribution from the plan itself, rather than directly from its corporate coffers.  This is

an important distinction as this was not a fee directly against the *employer*, but the employer-

sponsored health *plan*.  The only remaining question, then, is whether it was somehow illegal for

Metal Technologies to raise its employees' health insurance contribution to the plan on a one-time

basis (by deducting the $63.00) to cover the cost of the fee.  Metal Technologies has searched extensively, but has not located anything in the ACA or its regulations that directly addresses this question.  Importantly, however, there is no legal authority stating that a group health plan may *not* raise employee contributions to cover the cost of the TRP fee.[4]  It is Mr. Weil's burden to establish that Metal Technologies could not deduct this amount from his paycheck to cover the TRP fee, not Metal Technologies' burden to show that it could.  Mr. Weil cannot show that this deduction was unlawful under the ACA.

**Question 2: "And if Metal Technologies maintains that Mr. Weil's claim for the OF deduction is preempted, provide the explicit legal authority for its preemption defense."**

Section 514 of Title I of ERISA states "the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 4(a) . . . ." 29 U.S.C. § 1144(a).  It is well settled that section 514(a) "indicates Congress's intent to establish the regulation of employee welfare benefit plans as an exclusively a federal concern."  *See New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995) (internal citation and quotation omitted).  Specifically, Congress intended:

> to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government . . ., [and to prevent] the potential for conflict in substantive law . . . requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.

---

[4] Although it is not legal authority, Metal Technologies found this cite on the Society for Human Resource Management ("SHRM")' website, which is a nationally recognized human resources group. https://www.shrm.org/resourcesandtools/hr-topics/benefits/pages/pcori-reinsurance-fees.aspx.
In response to the question "May the [TRP] fee be passed along to participants?" SHRM states for self-funded plans: "Yes; nothing in the PPACA or regulations prevents a plan sponsor from recovering the Reinsurance Fee through increases in participant contributions."

*Id.* at 656-57 (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990)).  A law or claim "relates to" an employee benefit plan if it has "a connection with or reference to such a plan." *Id.*

There is no dispute that Mr. Weil signed up for the healthcare benefits offered by Metal Technologies at the time he began his employment.  *See* Exhibit I.  He was therefore a participant in Metal Technologies' healthcare plan.  It is also undisputed that Metal Technologies took the $63 deduction from Mr. Weil *because* he was a plan participant and that the deduction was to cover the 2014 TRP fee, which could legally be paid out of plan funds.  Weil nevertheless insists that taking this deduction was unlawful under Indiana wage laws, although Metal Technologies has struggled to determine the precise nature of what Mr. Weil's theory of liability.  Is it that Metal Technologies could not shift the burden of paying the TRP fee on its employees? Is it that Metal Technologies could not take the deduction because it did not comply with the terms of its healthcare plan (for instance, because he was not given proper notice or it was taken after he was terminated?).  Or is it simply that Metal Technologies could not take the deduction because it failed to comply with Indiana's Wage Deduction Statute, I.C. 22-2-6?  Based on the questioning at trial, it seems that Mr. Weil may be making all of these arguments.  Each of these theories of liability, however, is pre-empted under ERISA.

*First*, we address Mr. Weil's contention that Metal Technologies could not raise employee contributions to pay for the TRP, either because it is unlawful or violated the terms of Metal Technologies' healthcare plan.  It is important to keep in mind that Mr. Weil's claim is brought under the Indiana Wage Claims Act ("IWCA"), which simply states that an employee must be paid all wages due at the next regular pay day after his termination.  I.C. § 22-2-9-2(a).  There is nothing in the IWCA itself that establishes Metal Technologies could not take this deduction to cover the

TRP fee.  Rather, this prohibition would be included in the ACA.  As set forth above, there is nothing in the ACA or its regulations that prohibits an employer from raising employee contributions to cover the fee, and it was proper to pay for the fee through plan funds.  Mr. Weil's only other argument, then, is that taking the deduction violated the terms of Metal Technologies' healthcare plan.  Such a state law claim is clearly preempted under ERISA, as it "relates to" an employee benefit plan.  Additionally, Mr. Weil is attempting to enforce his rights under an ERISA plan, a claim that was required to be brought under Section 502(a) of ERISA.  *See Lister v. Stark*, 890 F.2d 941, 944 (7th Cir. 1989) (holding that ERISA completely preempts any claims that are cognizable under ERISA's civil enforcement provisions).

*Second*, is Mr. Weil's contention that the deduction did not comply with the Wage Deduction Statute because Metal Technologies did not have a proper wage deduction form at the time it made the deduction.[5]  The Indiana Wage Assignment Statute, however, is pre-empted by ERISA to the extent it is used to regulate, or add additional administrative burdens on, an employee benefit plan.  In *Cox v. SBC*, the Indiana Court of Appeals was directly confronted with the issue of whether the Indiana Wage Assignment Statute was pre-empted by ERISA if it was applied to deductions taken for an employee benefit plan.  816 N.E.2d 481 (Ind. Ct. App. 2004).  The plaintiff argued that his employer could not deduct from his pay for retrieving the overpayment of disability benefits under the Indiana wage statutes, and that "ERISA does not apply because the issue at hand deals with his wages, and therefore, Indiana Wage Deduction and Wage Payment statutes should apply."  *Id.* at 483-84.  The Court rejected this argument, holding that ERISA preempted the plaintiff's claims.  *Id.* at 485.  The Court specifically found preemption because if the Indiana wage

---

[5] Taking a deduction for a contribution to an employee healthcare plan is proper under the Indiana Wage Assignment Statute.  I.C. 22-6-2(b)(8).  Metal Technologies clearly took the deduction as a contribution to its employee healthcare plan to cover the cost of the TRP.  Whether it was lawful to take the deduction to cover the TRP fee is a separate issue that, as discussed above, is also preempted under ERISA.

statutes "were applied to address [the plaintiff's] grievances regarding benefits, such an application of these statutes would serve to regulate and 'relate to' an employee benefit plan." *Id.*

Here, Mr. Weil is attempting to add additional regulations to an ERISA plan by arguing that Metal Technologies was required to have a valid wage assignment form under I.C. 22-2-6(a) before it could deduct the $63.00 employee contribution to its healthcare plan.  This is clearly preempted by ERISA under the holding of *Cox*.  Additionally, the United States Department of Labor issued an advisory opinion in 2008 stating that a Kentucky law requiring an employer to obtain written consent before withholding amounts from an employee's wages is preempted by ERISA to the extent it is applied to deductions for contributions under an ERISA-covered group health plan.  *See* DOL Advisory Opinion to Eugene Scalia, February 8, 2008.

## ADDITIONAL FINAL ARGUMENTS

### I.  Additional Arguments as to Why the Court should find in Metal Technologies' Favor on Plaintiffs' Time Clock Claims.

#### A.  Plaintiffs have not established that Metal Technologies knew or should have known they were working before or after their shift or during their lunch break.

Even if the Court finds that Ms. Fulk's and Mr. Weil's testimony is credible and that they met their burden of proof to establish that they performed work for which they were not compensated, the Court should still rule in Metal Technologies' favor because they have not established that Metal Technologies had knowledge that they performed this work.  Although the FLSA requires an employer to pay for worked overtime, it "stops short of requiring the employer to pay for work it did not know about, and had no reason to know about."  *See Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 177 (7th Cir. 2011).

An employer's knowledge of time worked can be either actual or constructive.  *Id.*  An employer has constructive knowledge of time worked if it should have acquired the knowledge

through reasonable diligence.  *Allen v. City of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017).  In *Allen*, a recent Seventh Circuit case, the court held that '[o]ne way an employer can exercise diligence is by establishing a reasonable process for an employee to report uncompensated overtime."  *Id.*  The Seventh Circuit noted that this principle had been "implicit" in their previous cases, but cited with approval Sixth and Ninth Circuit opinions upholding summary judgment for the employer because the plaintiffs failed to use the process for reporting overtime established by the employer.  *Id.* at 939 (citing *White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869 (6th Cir. 2012) & *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413 (9th Cir. 1981)).

Metal Technologies set up a process for its employees to report overtime: employees are to submit an Overtime Authorization Form ("Overtime Form") to payroll to account for any time worked outside of their normal shift, including during their required lunch break.  This form alerted Kirbie Conrad, who processed payroll, that the employee actually worked before or after his or her shift or during his or her lunch break.  The form was necessary for this purpose as it was common for employees to clock in before or after their shift, but not perform work.  Kirbie Conrad had personal knowledge of this practice, as she often viewed employees socializing or eating breakfast before their shift or waiting to clock out after their shift.  In addition, the shift overlap time meant employees could not perform their inspection duties prior to their scheduled shift and ensured that they had ample time to perform their clean up duties before their shift ended.  As for lunch breaks, the Handbook clearly states that employees are required to take a lunch break every day and testimony established that employees often did not clock in and out for lunch – even though they took a lunch break – because they knew their lunch break was automatically deducted.  Additionally, the entire facility took their lunch break at the same time, meaning it would not have

been possible for one employee to decide to work during lunch without approval as they could not run a production line without other employees.

Ms. Conrad testified that she explained how to use the form to every employee during orientation, testimony that was confirmed by Mr. Clagg and Mr. Pollock.  It is undisputed that both Ms. Fulk and Mr. Weil were aware of the Overtime Form and used it to report overtime.  Ms. Fulk completed six overtime Forms during her employment, including one where she reported only 15 minutes of overtime.  *See* Exhibit D.  Ms. Fulk confirmed that she used the form to report both anticipated overtime and unexpected overtime that she had already worked.  Mr. Weil also completed an Overtime Form during his employment.  *See* Exhibit H.  Importantly, when Plaintiffs reported overtime on the forms as required *they were paid for the time reported*.

Plaintiffs argue that the form was not used to report missed or short lunches because the form itself states nothing about lunches.  But Ms. Conrad testified that she had forms submitted to her reporting missed lunches, and Mr. Clagg and Mr. Pollock also confirmed the form was used to report missed lunch breaks.  Additionally, Ms. Fulk completed two Overtime Forms where she specifically noted that she took "no lunch" during four hours of overtime.  *See* Exhibit D at MTI244 & MTI245.  Clearly, Ms. Fulk knew she could use the form to report a missed or short lunch.

Neither Ms. Fulk nor Mr. Weil provided any explanation for their failure to report time worked outside of their scheduled shift on Overtime Forms.  Ms. Fulk testified that she was required to come in early to gather information, yet she failed to complete forms for these days to alert Ms. Conrad that she was working before her shift, even though she had done so on other occasions when she was asked to work by a supervisor.  Her testimony that she did not realize that she was not being paid based on the time clock is simply not credible, as she received a paycheck every week and knew how much the company was paying her each week.  Additionally, *she*

*remained clocked in* even on the dates she completed overtime forms, which begs the question: If she believed she was paid for all on-the-clock time, why would she complete the form for some days when she clocked in early or stayed late, but not others?

The facts in *Allen* are similar to the facts above. The police department established a process for its officers to obtain overtime compensation by having them submit "time due slips" to their supervisors, who approved the overtime and sent them to payroll to be processed. *Allen*, 866 F. 3d at 939-40. The plaintiffs in the case knew about the time due slips and had used them in the past. *Id.* at 940. In fact, the *Allen* court went a step further noting that supervisors at times knew that the officers worked off duty on their Blackberrys, but this was insufficient to show knowledge of time worked because the supervisors had no reason to know the officers were not submitting slips to be paid for this time. *Id.* The Court stated it would have been "impractical" for supervisors to always ensure that the employees were completing a form to account for overtime. *Id.*

The Seventh Circuit upheld the district court's finding that the police department did not have actual or constructive knowledge that the police officers were failing to report unworked overtime. The Seventh Circuit reasoned that even though the supervisors may, at times, have had knowledge that the plaintiffs were working overtime, the plaintiffs failed to use the process established to report overtime through no fault of the employer. *Id.* at 942-43.

Plaintiffs here will likely argue that the time records should have alerted Metal Technologies' that they were working before and after their shift or during their lunch break. But the testimony establishes that this simply is not the case. Metal Technologies allowed employees to clock in early and late, and employees did so and did *not* perform compensable work based on the personal knowledge of Ms. Conrad. Additionally, employees failed to clock in and out for

14

lunch, yet still took a full lunch.  Thus, the time records themselves would not have automatically shown that an employee actually *worked* outside of their shift, which is exactly why Metal Technologies required employees to submit an Overtime Form.  *See Kellar*, 664 F.3d at 177 (granting summary judgment for employer because the plaintiff's early time punches would not have alerted the employer about her pre-shift work prior to the scheduled shift was "contrary to the conditions prevailing in the business generally").  As the Seventh Circuit stated in *Allen*, the standard for knowledge is not what the employer "could" have known, but what is "should" have known.  *Id.* at 943.  The Court should follow the reasoning in *Allen* and find that Plaintiffs failed to establish that Metal Technologies had knowledge that they worked outside of their shift for any overtime they failed to report on an Overtime Form.

**B. Metal Technologies "rounded" lunch breaks to favor both the employer and employee.**

Assuming the Court finds in favor of Mr. Weil and Ms. Fulk worked during their lunch breaks, their "rounding" claim still fails because Metal Technologies rounded to favor both the employer and employee.   *Neutral* rounding is not prohibited by the FLSA.  *See Weil v. Metal Techs., Inc.*, 2016 U.S. Dist. LEXIS 8100 *18 (S.D. Ind. Jan. 25, 2016) ("At the outset, the Court acknowledges that rounding practices or policies to determine the employees' hours of pay are not prohibited by the FLSA" as long as it does not result in the failure to properly pay employees for all hours worked).

Mr. Weil and Ms. Fulk both have days where they recorded *longer* than a 30 minute lunch break, yet Metal Technologies still deducted only 30 minutes for lunch and paid them for eight working hours.  For Ms. Fulk, these dates are: September 8, 2014 (32 minute lunch) and September 20, 2014 (clocked out for 21 minutes on a weekend, but was only provided a 20 minute lunch).  *See* Exhibit B.  For Mr. Weil, these dates are: November 12, 2014 (31 minute lunch), November

20, 2014 (31 minute lunch), and December 3, 2015 (31 minute lunch). *See* Exhibit F. Because Plaintiffs have not shown that Metal Technologies' rounding was non-neutral, their claim fails.

### C. Mr. Weil has no FLSA claim because he cannot demonstrate that he was not paid for *overtime* hours.

In addition to the arguments above, Mr. Weil's FLSA claim fails for yet another reason: he cannot establish that he was not paid for on-the-clock time that reflects *overtime* hours. Mr. Weil's only claim of unpaid on-the-clock time occurred in the week of November 26, 2014 (for .27 hours of unpaid time) and the week of December 19, 2014 (for .57 hours of unpaid time). *See* Exhibit 10. By Plaintiff's own admission, the .27 hours of unpaid time on November 26 is completely offset by the double time he was paid that week. *Id.* As for the .57 hours in the week of December 19, this time does not reflect *overtime* hours as he only recorded about 13 hours of work that week. *Id.* Mr. Weil's Exhibit 10 clearly demonstrates that he has *no* damages under the FLSA. Accordingly, his FLSA claim fails as a matter of law.

## II.   Additional Damages Arguments

### A. Mr. Weil and Ms. Fulk cannot pursue overtime claims under the Indiana wage statutes.

As is clear from their damages analyses, Plaintiffs are attempting to pursue claims under both the FLSA and Indiana wage statutes for the *same* unpaid hours. They seek unpaid overtime for time worked over 40 hours per week (plus liquidated damages) *and* treble damages under the IWPA and IWCA *for these same hours* at a straight time rate. But Plaintiffs may not pursue claims for hours in excess of 40 hours in a workweek under the IWPA or the IWCA, as such claims involve overtime hours under the FLSA. Calculation of wages owed for hours over 40 in a workweek must be made pursuant to the FLSA, including the requirement to pay one-and-one-half times the regular rate. Under Indiana law, overtime claims cannot be raised under the Indiana

Wage Payment Statute (or the Indiana Wage Claim Statute); the exclusive remedy is the FLSA. *Edmonds v. Ferralloy Midwest Corp.,* 2009 U.S. Dist. LEXIS 47117 **20-21 (N.D. Ind. June 3, 2009) (citing *Parker v. Schilli Transp.,* 686 N.E.2d 845, 851 (Ind. Ct. App. 1997). See also, *Neely v. Facility Concepts, Inc.,* 2017 U.S. Dist. LEXIS 51086 *14 (S.D. Ind. April 4, 2017). Their attempt to "double-dip" in this way is improper.

**B.  Plaintiffs' claim they have damages under the IWPA/IWCA when they do not.**

Plaintiffs claim that they are *not* seeking overtime compensation under the IWPA and IWCA, but are only seeking straight time damages.  But their damage analyses is inconsistent with this contention, as they are claiming damages for workweeks when they were actually paid *more* than their straight time rate for all on-the-clock hours.  For instance, for the pay check dated September 26, 2014, Ms. Fulk alleges that she "worked" 57.27 hours based on her time clock records, but was only paid for 56 hours that week. *See* Exhibit 3. Based on 57.27 hours times her hourly rate of $11.00 per hour, Ms. Fulk is claiming she should have been paid $629.97 hours in straight time pay that week.  But she was actually paid $748.00 that week. *See* Exhibit 1.  Thus, she was paid *more* than her straight time hours for that week.  Ms. Fulk is nevertheless seeking 1.27 of unpaid straight time *plus treble damages* for that week.

The same is true for Mr. Weil.  For paycheck dated November 26, 2014, Mr. Weil claims he was not paid for .27 of on-the-clock time because Metal Technologies paid him for 56 hours, instead of 56.27 hours. *See* Exhibit 10.  Multiplying his regular rate of $11.00 by 56.27, he should have been paid $618.97.  Instead, he was paid $671.02 or *more* than his straight time hours that week.  In other words, Plaintiffs' damages under the IWPA and IWCA are overinflated because they do not consider what they were *actually paid* during the weeks they are alleging unpaid straight time pay.

17

**C.  The Court should not award treble damages under the IWPA or IWCA.**

In *Brown v. Bucher & Christian Consulting, Inc.*, 87 N.E.3d 22, 25-27 (Ind. Ct. App. 2017), the Indiana Court of Appeals held that the current version of Indiana Code § 22-2-5-2 should be applied retroactively as the purpose of the amended statute was remedial.  The new version of the IWPA only provides for liquidated damages in the amount of two times the amount of wages due *if* the Court finds Metal Technologies was not acting in good faith.  *Id.*  Thus, because the Court applies the new version of the statute to Plaintiff's claims, treble damages are no longer automatic.  Rather, in order to award treble damages, the Court must make a finding that Metal Technologies did not act in good faith.[6]

There is no evidence that Metal Technologies acted in bad faith when it did not pay Plaintiffs based on their time clock records, rather than based on their shift.  As discussed above, Metal Technologies has provided good reasons for its policy that employees are paid based on their shift unless they complete an Overtime Form.  Plaintiffs were clearly aware of the Overtime Form, yet failed to use it to report work allegedly completed outside of their scheduled shift or during lunch.  There is simply no evidence that Kirbie Conrad did not pay Plaintiffs in good faith, especially because when they turned in Overtime Forms they were paid for the time reported.

Additionally, the only evidence submitted at trial shows that Metal Technologies deducted the $63 from Mr. Weil's paycheck in good faith.  Ms. Conrad testified that her insurance provider told her she could deduct $63 from each plan participant to cover the fee.  Ms. Conrad relied on the advice of her insurance provider, showing that the deduction was made in good faith.

---

[6] Plaintiffs are not seeking treble damages for uniform deductions taken after April 10, 2016.

**]III.    Plaintiffs have not demonstrated that the uniform deductions taken after April 10, 2016, were improper.**

Indiana Code § 22-2-6-2 governs the requirements for assignment of wages.  Indiana Code § 22-2-6-2(a)(1) states that an assignment of wages is valid only if it is: (1) in writing; (2) signed by the employee; (3) revocable by its terms at any time by the employee upon written notice to the employer; and (4) agreed to in writing by the employer.  Subsection (a) also requires that the assignment be made for a purpose enumerated in subsection (b).  I.C. § 22-2-6-2(a)(3).  The amended version of the statute, in effect from July 1, 2015, added several permissible deduction purposes, including "[t]he purchase of uniforms and equipment necessary to fulfill the duties of employment. . . . "  I.C. § 22-2-6-2(b)(14).

On April 11, 2016, Metal Technologies updated its "Premiums and Deductions" form to add language stating, "This agreement is revocable at any time upon written notice to Metal Technologies' Human Resources Department."  The form was created by Metal Technologies, given to employees to sign if they wished to have deductions taken for uniforms, kept by Metal Technologies' in the employees' files, and executed by Metal Technologies through the agreed-upon deductions.

Metal Technologies' updated form satisfies the "agreement in writing" requirement of I.C. § 22-2-6-2(a)(1)(D).  First, Metal Technologies generated and distributed the writing.  Second, Metal Technologies received and maintained the form in its files.  Third, the form affirmatively describes the wage assignment's terms, which Metal Technologies proposed and carried out following the form's execution by deducting the wages.

Plaintiffs also assert the deductions for uniforms were not proper after April 10, 2016, because Metal Technologies rents the uniforms for their employees' use from an outside company, rather than buying them to own.  According to Plaintiffs, this means Metal Technologies did not

"purchase" the uniforms.  The Merriam-Webster dictionary defines "purchase" as "to obtain by paying money or its equivalent."  *See* https://www.merriam-webster.com/dictionary/purchase.  To "purchase" something does not require ultimate *ownership* of the item; only that it be obtained by paying money.

Finally, Plaintiffs argue that the uniform deduction was improper because the uniforms were not necessary to perform the duties of employment as employees could choose to wear their own clothes to work rather than purchase uniforms.  The statute is ambiguous regarding whether the phrase "necessary to fulfill the duties of employment" refers to *both* uniforms and equipment or just equipment.  It makes little sense for this phrase to modify the term "uniforms," as when is it ever "necessary" to wear a uniform to perform work duties?  Equipment, such as certain tools or safety equipment, may be necessary to perform job duties, but uniforms are generally a *preference* of either the employer or employee, not a necessity.  Even those in the service industry *could* perform their duties without a uniform if the employer allowed it.  For this reason, Metal Technologies believes that the phrase "necessary to fulfill the duties of employment" modifies only the term "equipment," not uniforms.  Accordingly, Metal Technologies' deduction for uniforms was lawful.

## IV.   Ms. Fulk may not pursue injunctive relief on the uniform deduction claim because she lacks standing.

At trial, Ms. Fulk indicated that she was seeking an injunction against Metal Technologies to prevent it from continuing to take uniform deductions.  A plaintiff seeking injunctive relief must show that she is currently suffering some injury or is in immediate danger of sustaining a direct injury.  *See Butler v. Ill. Bell Tel. Co.*, 2008 U.S. Dist. LEXIS 11901 *21 (N.D. Ill. Feb. 14, 2008).  Past exposure to unlawful conduct is insufficient unless it is accompanied by a continuing adverse effect on the plaintiff.  *Id.* (citing *Piggee v. Carl Sandburg College*, 464 F.3d 667, 673 (7th Cir.

20

2006)).  Because Ms. Fulk was a former employee when she filed suit against Metal Technologies, she does not have standing to pursue injunctive relief on behalf of the class.  *Id.* (holding that class representatives did not have standing to pursue injunctive relief under Rule 23 because they were former employees at the time the complaint was filed).

Respectfully submitted,

/s/ Michael W. Padgett
Michael W. Padgett
Melissa K. Taft
Jackson Lewis P.C.
10 West Market Street, Suite 2400
Indianapolis, Indiana 46204
Telephone: (317) 489-6930
Facsimile:  (317) 489-6931
E-mail:  padgettm@jacksonlewis.com
             melissa.taft@jacksonlewis.com

*Attorneys for Defendant,*
*Metal Technologies, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 20, 2018, I filed the foregoing *Defendant's Post-Trial Brief* electronically with the Clerk of the Court.  Notice of this filing will be sent to the following by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

> Robert P. Kondras, Jr.
> Hunt, Hassler, Lorenz & Miller, LLP
> 100 Cherry Street
> Terre Haute, Indiana 47807
> kondras@huntlawfirm.net

> /s/ Michael W. Padgett
> Michael W. Padgett

4815-0595-6189, v. 1

22